IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

YELLOWBOOK INC.,                    :    CIVIL ACTION
                                    :    NO. 11-4526
      Plaintiff,                    :
                                    :
      v.                            :
                                    :
ALWAYS IN SERVICE, INC.,            :
et al.,                             :
                                    :
      Defendants.                   :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          AUGUST 12, 2013

I.      INTRODUCTION ......................................... 2

II.     FACTS & PROCEDURAL POSTURE ........................... 3

III.    APPLICABLE LEGAL STANDARDS ........................... 8

IV.     PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S
        FIRST AMENDED COMPLAINT .............................. 9

   A.   No Genuine Issue of Material Fact Exists as to the
        Validity or Terms of the Parties' Contracts ......... 9

     1. Contract Formation: Eighty-Six Valid Contracts Exist 10

     2. Contract Terms ...................................... 12

        a.  Price Term...................................... 12

        b.  Terms on Reverse Side of Contract, Including
            Paragraph 15 Authority.......................... 13

        c.  Additional Terms on Reverse Side............... 15

   B.   No Genuine Issue of Material Fact Exists as to
        Defendants' Breach of Their Payment Obligation Under
        the Contracts ....................................... 17

   C.   Plaintiff's Damages and Defendants' Alleged Issues of
        Material Fact Regarding Credits-Owed and Plaintiff's
        Breach .............................................. 21

     1. Alleged Credits-Owed Issue .......................... 21

     2. Plaintiff's Alleged Breach .......................... 22

V.      PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS'
        COUNTERCLAIM ........................................ 25

VI.     CONCLUSION .......................................... 30

## I. INTRODUCTION

Plaintiff, Yellowbook, Inc., formerly known as Yellow Book Sales and Distribution Company, Inc. ("Plaintiff"), brings this action against Defendants, Always in Service, Inc., doing business as 24/7 Emergency Locksmith ("AIS"), Guy Halperin ("Halperin"), and Yuvall Attoun ("Attoun," and AIS, Halperin and Attoun, collectively, "Defendants"). Plaintiff alleges, generally, that Defendants breached the parties' written contractual agreements for directory advertising services, and seeks recovery of the unpaid balance of $997,842.61, together with interest and attorney's fees. Pl.'s First Am. Compl., ECF No. 24.

Plaintiff's First Amended Complaint ("Complaint") pleads the following: Count I Breach of Contract against Defendant AIS; Counts II-III Breach of Contract against Defendants Halperin and Attoun, respectively; Count IV Account Stated; and Count VI[1] pleads an alternative theory of Unjust Enrichment. Id. at 9-19. In response, Defendants deny the existence of any contracts between the parties and thus deny liability for any unpaid balance. Defendants have also asserted a counterclaim against Plaintiff, alleging Plaintiff's breach of

---

[1]     Plaintiff's First Amended Complaint does not include a Count V.

certain "oral" contracts. Defs.' Answer & Countercl., ECF No. 27.

Pending before the Court are Plaintiff's motions for summary judgment. Pl.'s Mot. Summ. J. on Plaintiff's First Am. Compl., ECF No. 49; Plaintiff's Mot. Summ. J. on Defs.' Countercl., ECF No. 50. Because Defendants fail to meet their burden of production at this stage of the proceeding, the Court will grant Plaintiff's motions for summary judgment.

## II.  FACTS & PROCEDURAL POSTURE[2]

According to Plaintiff's Complaint, the parties entered into a series of written contractual agreements with Plaintiff, contracting for advertising and related services to market and promote Defendants' business, which included locksmith and security repair and installation services, and the repair, replacement, removal, installation, or alteration of windows, doors and garage doors. The Complaint alleges that, beginning in July 2009, Attoun personally, and on behalf of AIS, entered into multiple written contractual agreements with Plaintiff for several 2010 through 2011 Yellowbook publications. Similarly, beginning in February 2010, Halperin personally, and on behalf of AIS, entered into multiple written contractual

---

[2]    In accordance with the appropriate standard of review, see infra Section III, the Court views the facts in the light most favorable to the non-moving party.

agreements with Plaintiff for several 2010 through 2012
Yellowbook publications.

Relevant here, Plaintiff alleges that AIS entered into
a total of eighty-six two-sided contracts, for which Plaintiff
alleges a total balance of $997,842.61 is due and outstanding.
Of these eighty-six contracts, Plaintiff alleges that Attoun
also personally bound himself for thirty-two contracts, for
which Plaintiff alleges a $243,519.50 balance remains
outstanding; similarly, Plaintiff alleges that Halperin also
personally bound himself for fifty-four contracts, for which
Plaintiff alleges a $754,323.11 balance remains outstanding.
Pl.'s First Am. Compl. 8-9.

The parties attempted but were unable to resolve their
conflicts informally. Thus, on July 18, 2011, Plaintiff
initiated this breach-of-contract action. Pl.'s Compl., ECF No.
1. Defendants Halperin and Attoun filed a Motion to Dismiss
(ECF No. 12), and Defendant AIS filed an Answer and
Counterclaim. Defs.' Answer & Countercl., ECF No. 13.
Following a hearing on the motion to dismiss, held on November
7, 2011, the Court issued a scheduling order granting Plaintiff
leave to file an amended complaint by November 17, 2011. Order,
Nov. 7, 2011, ECF No. 22. On November 17, 2011, Plaintiff filed
its First Amended Complaint. Pl.'s First Am. Compl.

Initially, and without reason other than neglect for their tardiness, Defendants failed to appear, plead, or otherwise defend. Accordingly, default was entered against them on December 21, 2011. On December 22, 2011, Defendants filed an Answer to Plaintiff's First Amended Complaint and Counterclaim.[3] Defs.' Answer & Countercl., ECF No. 27. Thereafter, on January 11, 2012, preferring to decide the case on the merits and given the lesser sanctions available, the Court granted Defendants' Motion to Set Aside Default (ECF No. 26), and instead sanctioned Defendants $500 to compensate Plaintiff for having requested the entry of default. Order, Jan. 11, 2012, ECF No. 33.

---

[3] Defendants' breach-of-contract counterclaim essentially seeks damages for lost profits, following a lawsuit that the Pennsylvania Attorney General filed against AIS for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection law. In their counterclaim, Defendants allege that Plaintiff induced Defendants to purchase "local phone numbers" and "remote call forwarding numbers," and to use these numbers in AIS advertisements. Further, Defendants allege that—without their authorization—Plaintiff pursued an advertising strategy giving the impression that AIS was a local company, knowing that this was improper. Defendants allege that the Attorney General's case against AIS was based, in large part, on the deceptive advertising practices for which Plaintiff is ultimately responsible. Thus, Defendants filed a counterclaim against Plaintiff seeking lost profits. Notably, however, the Pennsylvania Attorney General did not implicate Plaintiff in its case against AIS.

Also noteworthy is that Defendants have filed a similar lawsuit against another advertiser. See Always in Service, Inc. v. SuperMedia Services-East, Inc., No. 11-127.

On June 1, 2012, the Court conducted a discovery conference. At the conference, it became clear that considerable confusion existed regarding what claims Plaintiff was asserting under what contracts, and what defenses to those claims Defendants were raising. To streamline the litigation and join the issues, the Court ordered Plaintiff to file motions for summary judgment on both its First Amended Complaint and Defendants' Counterclaim. Order, June 1, 2012, ECF No. 47. Additionally, the Court ordered Plaintiff to produce, among other discovery, records identifying any credits posted to Defendants' accounts for mistakes, complaints, or similar communications recorded in call logs, emails, or similar correspondence between Plaintiff and Defendants. Id. The Court further instructed Defendants that if additional discovery was needed to respond to Plaintiff's motions for summary judgment, Defendants could make such a demand under Rule 56(d) of the Federal Rules of Civil Procedure. Hr'g Tr. 39:4-25, June 1, 2012, ECF No. 58.

In accordance with the Court's order, on June 18, 2012, Plaintiff filed the instant Motion for Summary Judgment on Plaintiff's First Amended Complaint (ECF No. 49) and Motion for Summary Judgment on Defendants' Counterclaim (ECF No. 50). Defendants filed a Response in Opposition to Plaintiff's Motion for Summary Judgment on Plaintiff's First Amended Complaint (ECF

No. 54) and a Response in Opposition to Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim (ECF No. 55). Defendants did not file a Rule 56(d) Affidavit. Hr'g Tr. 14:24-15:15, July 2, 2013, ECF No. 70. Plaintiff filed a Reply (ECF No. 60). Defendants filed a Surreply (ECF No. 61). Plaintiff filed a Response in Opposition to Defendants' Surreply (ECF No. 62).

On July 2, 2013, the Court held a hearing regarding Plaintiff's motions. During the hearing, Defendants represented to the Court that by responding to Plaintiff's motions for summary judgment and not including a Rule 56(d) Affidavit, they had declined further discovery and instead wished to proceed to the merits of the motions, based on their submissions and the evidence before the Court. Hr'g Tr. 16:11-17:16, July 2, 2013 (representing to the Court, "We oppose on the merits.").[4]

Following the hearing, at the Court's recommendation the parties met with a Magistrate Judge to conduct a settlement conference but were unable to reach an agreement. Plaintiff's motions are thus now ripe for disposition.

---

[4]     On July 21, 2013, eleven months after moving the Court to consider their Surreply, Defendants filed what appears to be an affidavit and exhibits supplementing their submissions in response to Plaintiff's motions for summary judgment. ECF No. 71. As Defendants have not moved the Court for leave to file these additional submissions or otherwise explained the relevance of their submissions, the Court will not consider them in disposing of the instant motions.

## III. APPLICABLE LEGAL STANDARDS

Summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact."  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party."  Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)).  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who

must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. At this stage in the proceedings, a party may not decline to produce evidentiary support and simply rest on generalized denials or averments in the pleadings. Rather, the non-moving party must point to particular evidence of record that would be admissible at trial in support of its argument that a genuine issue of material fact exists. See Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDED COMPLAINT

To prevail on its motion for summary judgment as to the claims alleged in its Complaint, Plaintiff must demonstrate the following: (1) that valid written contracts existed between the parties and the terms thereto; and if so, (2) whether Defendants breached their duty to pay under the contracts, and (3) resultant damages, taking into consideration any set-off provided Defendants substantiate the basis for such a set-off. The Court will address each issue in turn.

### A. No Genuine Issue of Material Fact Exists as to the Validity or Terms of the Parties' Contracts

In sum, Plaintiff points to evidence of record—including the eighty-six contracts, themselves, a record

custodian's affidavit, and accounting statements—to support its contention that the parties entered into valid contracts for the advertising services at issue.[5]  Defendants argue that these contracts are not valid because several are unsigned. Additionally, Defendants argue that any contracts that were signed were entered into solely with AIS, and not with its officers or owners.  Lastly, Defendants argue that the terms on the reverse side constitute a separate, unsigned contract, and thus are not included in the parties' agreements.  However, as the evidence of record belies these arguments, Defendants fail to raise genuine issues of material fact as to the existence and terms of the parties' contracts.

### 1. Contract Formation: Eighty-Six Valid Contracts Exist

Regarding AIS as a party to the contracts at issue, Defendants admit that AIS signed fifty-one of the eighty-six contracts.  Defs.' Br. in Support of Resp. to Pl.'s Mot. Summ. J. on Pl.'s First Am. Compl. 9, ECF No. 54.  As to the remaining thirty-five contracts that Defendants allege are "unsigned," Plaintiff has asserted—and supported by way of a record custodian's affidavit—that where a customer enters multiple

---

[5]  See Pl.'s Mot. Summ. J. on Pl.'s First Am. Compl. Exs. C, E, F; see also Pl.'s Mot. Summ. J. on Defs.' Countercl. Exs. B1-B26, ECF No. 52 (filed in hard copy); Pl.'s Mot. Summ. J. on Pl.'s First Am. Compl. Exs. D1-D23, D24-D45, ECF No. 52 (filed in hard copy).

contracts on the same day, standard industry practice allows for the customer to bind himself by signing only the last page of a paginated contract. Pl.'s Mot. Summ. J. on Pl.'s First Am. Compl. Ex. F, Coleman Aff. 4.

Defendants offer no evidence to rebut this industry custom. Nor do they claim that they did not understand this to be the custom when signing the last page of paginated contracts. Moreover, Defendants rendered payments on these contracts until May 2011—including the allegedly "unsigned" paginated contracts—totaling $405,672.05.

As to Halperin's and Attoun's personal liability, although the parties agree that AIS was always the customer, the signature line of the contracts expressly states: "Authorized Signature Individually and for the Customer (Read Paragraph 15 on the reverse hereof)." Thus, as the Court stated during a previous hearing, "[c]oncerning the argument that the defendants Halperin and Attoun are not individually liable, the Court notes the actual language of the contract which indicates in clear and unambiguous terms that the contract is being entered by the authorized [party signing] individually and for the company." Hr.'g Tr. 13:21-14:1, Nov. 7, 2011, ECF No. 56 (noting also that contracts at issue are business contracts and not consumer contracts, thus vitiating contract-of-adhesion concerns). Accordingly, the Court finds that Defendants fail to raise a

genuine issue of material fact as to the validity of the eighty-six contracts at issue: Halperin signed fifty-four of the contracts, individually and for AIS; and Attoun signed thirty-two contracts, individually and for AIS.

### 2. Contract Terms

Defendants also dispute the terms of the eighty-six contracts. Accordingly, the Court will next address whether any genuine issues of material fact exist as to the applicable terms of the parties' contracts.

#### a. Price Term

Central to this case, Plaintiff represents that it rendered advertising and related services totaling $1,403,514.66. Defendants do not contest that they made partial payments for these services through May 2011, totaling $405,672.05. Pl.'s Br. in Support of Mot. Summ. J. on Pl.'s First Am. Compl. 8-10, ECF No. 49. However, Defendants contest what if any amount remains unpaid. Hr'g Tr. 21:19-24, July 2, 2013.

Plaintiff points to the eighty-six contracts, and calculates the aggregate value of the services owed under the contracts is $1,403,514.66. Pl.'s Br. in Support of Mot. Summ. J. on Pl.'s First Am. Compl. 9. Although Defendants specifically deny that Plaintiff's advertisements were worth

that amount, they do not dispute this accounting.[6]  Accordingly,

the Court recognizes $1,403,514.66 as the aggregate price of

advertising and related services for which the parties

contracted.

   b. Terms on Reverse Side of Contract, Including
      Paragraph 15 Authority

   As to the other terms of the contracts, each contract

at issue consists of one page, with the sales terms and

signature line appearing on the front and additional terms

appearing on the reverse.  The signature line on the front

refers the signer to the reverse side, and expressly references

Paragraph 15 therein, which states:

> Authority; Persons Obligated; Signer Obligated: The
> signer agrees that he/she has the authority and is
> signing this agreement (1) in his/her individual
> capacity, (2) as a representative of the Customer, and
> (3) as a representative of the entity identified in
> the advertisement or for whose benefit the
> advertisement is being purchased (if the entity
> identified in the advertisement is not the same as the
> Customer or the signer).  By his/her execution of this
> agreement, the signer personally and individually
> undertakes and assumes, jointly and severally with the
> Customer, the full performance of this agreement,
> including payment of amounts due hereunder.

Id. at 7-8 (also quoting additional pertinent contract

provisions listed on reverse side, including Paragraph 15 as

---

[6]     Separate from the face value of the contracts, the
issues that Defendants raise—namely, whether Plaintiff
materially breached subsequent oral contracts thereby excusing
Defendants' full payment obligation and creating a set-off—will
be addressed, infra.

well as merger clause, and clause limiting authority of sales representative).

Defendants specifically deny that Paragraph 15 is part of the contract. This argument is plainly without merit. See, e.g., Smith v. Enterprise Leasing Co., 833 A.2d 751, 752, 755 (Pa. Super. 2003) (recognizing waiver provision on reverse side of contract as valid term of contract where plaintiff signed page which stated, "I have read and agree to the terms and conditions on both sides of this agreement"). In Smith, that the signatory's signature appeared on the reverse side of the provision in question did not make it any less valid. Id.

Here, in addition to the signature line, which specifically refers the signer to Paragraph 15 on the reverse side, the front page of the contract also incorporates the terms on the reverse side, expressly stating: "THE TERMS AND CONDITIONS SET FORTH OR REFERRED TO HEREIN AND ON THE REVERSE SIDE HEREOF . . . ARE AGREED TO BY CUSTOMER AND SIGNER." Moreover, the reverse side does not contain a separate signature line. Defendants point to no evidence of record to the contrary, demonstrating a genuine issue of material fact as to whether the terms on the reverse side are part of the parties' agreement. Accordingly, the Court finds that terms on the reverse side are indeed part of the parties' agreement, including Paragraph 15.

## c. Additional Terms on Reverse Side

The Court notes that the reverse side of each contract also includes the following additional relevant provisions. Paragraph 1 provides Plaintiff's obligations under the contract: "Publisher will publish advertising in the Directories and/or provide the Internet services, in accordance with the terms and conditions of this agreement." Pl.'s Br. in Support of Mot. Summ. J. on Pl.'s First Am. Compl. 12. Paragraph 7(A) additionally provides: "Publisher will endeavor to furnish proofs of new and revised display print advertisements, but failure to do so will not relieve Customer of its obligations under this agreement." Pl.'s Br. in Support of Mot. Summ. J. on Defs.' Countercl. 3, ECF No. 50 (quoting contract language).

Paragraph 7(D) provides, in pertinent part:

> Customer agrees that Publisher, its employees, affiliates and agents shall not be liable for errors or omissions in directory advertising in excess of the amount paid for the item(s) and shall not be liable for lost profits, direct or indirect, special, consequential, incidental or contingent damages arising out of such an omission or error. No adjustment will be given for delay of publication or distribution changes in the anticipated number of directories to be published or distributed. Publisher's liability for errors in listings shall be limited to the price of the listing in question.

Id. at 2 (quoting contract language).

Paragraph 7(E) provides:

In no event will Publisher, its employees, affiliates or agents be liable to Customer for any other damages including, but not limited to, alleged loss of business, revenues or profits or the cost of other forms of advertising. Customer understands that this limitation of liability will apply to any claim against publisher, its employees, affiliates and agents, including, but not limited to, claims based on breach of contract, tort (such as negligence) or strict liability or statute.

Id. (quoting contract language).

Paragraph 10(A) provides, in pertinent part:

Customer represents and warrants that it has the right to use any trademark, trade name, or copyrighted material included in any copy submitted to Publisher. Customer also represents and warrants that it has the right to use any artwork, portrait, picture or illustration if a person shown in any copy submitted to Publisher. Customer will notify Publisher, in writing, if Customer should cease to have any such right.

Id. at 3 (quoting contract language).

Paragraph 10(B) provides, in pertinent part:

Customer represents and warrants that it holds all necessary permits and licenses to provide the products and services identified in its print advertising or in the Internet Services and to appear under the heading classification(s) listed on the reverse side of this agreement. Customer agrees that it is responsible for ensuring that its print advertising and Internet Services comply with any laws or regulations that may be applicable to its business.

Id. (quoting contract language).

Paragraph 10(C) provides, in pertinent part:

Customer agrees to indemnify Publisher (and its employees, affiliates, and agents) against, and hold Publisher (and its employees, affiliates, and agents) harmless from, all liability, claims demands, suits or

causes of action, whether or not partially attributable to the negligence of the Publisher, and will pay all expenses, including reasonable attorney fees, settlements, and/or judgments, incurred by Publisher in the defense thereof, arising out of Customer's breach or alleged breach of the foregoing representations and warranties.

Id. (quoting contract language).

Lastly, Paragraph 8 provides, in pertinent part:

With respect to print services, Customer may cancel this agreement, upon written notice to Publisher given prior to the seventh (7th) day after Customer signs this agreement . . . . Customer shall give any written notice to Publisher required by this Agreement by certified mail, return receipt requested, reputable overnight courier or hand delivery.

Id. at 4 (quoting contract language).

    B.   <u>No Genuine Issue of Material Fact Exists as to Defendants' Breach of Their Payment Obligation Under the Contracts</u>

The Court will next address the parties' performance under the contracts; specifically, whether Defendants breached their obligation to pay for services rendered. The parties do not dispute that they began to perform their obligations under the contracts. Plaintiff published advertisements on behalf of Defendants, and Defendants made monthly installment payments, as required pursuant to the contracts.[7] However, Defendants ceased making payments on their accounts as early as March 2011.[8]

_____

[7] Notably, the parties' performance under the contracts is further proof of the existence of contracts. Notwithstanding denying that they entered into any contracts with Plaintiff,

17

Plaintiff's First Amended Complaint rests
predominantly on a breach of contract claim.  The parties agree
on the applicable legal standard governing this claim.  To state
a claim for breach of contract, Plaintiff must establish the
following elements: the existence of a contract, including its
essential terms; a breach of a duty imposed by the contract; and
resultant damages.  See, e.g., Omicron Sys. v. Weiner, 860 A.2d
554, 564 (Pa. Super. 2004) (citation omitted).  The plaintiff
typically bears the burden of proof as to damages.  Id.
Although courts have observed that the determination of damages

---

Defendants admit that they rendered payments to Plaintiff.
Defendants do not deny that these payments were in exchange for
Plaintiff publishing advertisements for AIS.  Instead,
Defendants argue that the advertisements Plaintiff published
were so different from those that AIS requested as to constitute
a material breach, and that the errors rendered these
advertisements not worth the value listed in the contracts.
Defs' Br. in Support of Resp. to Pl.'s Mot. Summ. J. on Defs.'
Countercl. 7, ECF No. 55.  Defendants' arguments address neither
contract formation nor initiation of performance, but instead
raise issues regarding damages, which the Court will address,
infra.

[8]     Plaintiff's brief in support of its Motion for Summary
Judgment on Defendants' Counterclaim lists the date after which
Defendants ceased making payments, as promised, as March 2011.
Pl.'s Br. in Support of Mot. Summ. J. on Defs.' Countercl. 4.
However, the accounting records provided with Plaintiff's Motion
for Summary Judgment on Plaintiff's First Amended Complaint
indicate payment activity as late as May 2011.  As to account-
specific payment records, the Court will rely on the accounting
statements and affidavit testimony as evidence of record
regarding damages.

is generally a question for the fact-finder at trial,[9] to survive a motion for summary judgment as to damages, the non-moving party must still raise a genuine dispute of material fact. Fed. R. Civ. P. 56(a).

Contract interpretation is an issue of law for the court to determine. Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983) (citations omitted). Where that language is clear and unambiguous, a court must give effect to that language. Id.; see also Germantown Sav. Bank v. Talaki, 657 A.2d 1285, 1289 (Pa. Super. 1995) (holding that, absent fraud, failure to read contract before signing is "an unavailing excuse or defense that cannot justify an avoidance, modification or nullification of the contract"). The Court begins with the premise that public policy favors freedom of contract, which presupposes that individuals are capable of entering into and fulfilling their own agreements. See Com. Dep't of Transp. v. Paoli Const. Co., 386 A.2d 173, 175 (Pa. Commw. Ct. 1978).

Here, AIS entered into a total of eighty-six two-sided contracts for advertising services with Plaintiff. Of these

---

[9]    Omicron Sys., 860 A.2d at 564 ("The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses.")

eighty-six contracts, Attoun signed thirty-two, binding AIS and himself, personally; and Halperin signed fifty-four, binding AIS and himself, personally.

Based solely on the clear and unambiguous language, Defendants contracted for $1,403,514.66 worth of advertising and related services.[10]  Having remitted $405,672.05 in payments, a total balance of $997,842.61 remains due and outstanding.  Of this $997,842.61, Attoun is personally bound for $243,519.50, and Halperin is personally bound for $754,323.11.  Defendants do not dispute that they ceased making payments under these contracts.  Accordingly, the Court finds that Plaintiff has met its Rule 56 burden, preliminarily demonstrating the existence of the eighty-six written contracts, the terms of those contracts, and that Defendants breached their payment obligations under these contracts—constituting material breaches for which Plaintiff is entitled to damages.

---

[10]     Consistent with freedom-of-contract principles, the Court sees no reason to deviate from the parties' agreed-upon value for advertising services, as stated in the eighty-six written contracts.

As to Defendants' argument that these contracts constitute "contracts of adhesion," whose terms they had no choice but to accept, the Court notes that the parties entered into these contracts as merchants and not as consumers.

C.  Plaintiff's Damages and Defendants' Alleged Issues of Material Fact Regarding Credits-Owed and Plaintiff's Breach

Next, the Court will address Defendants' two main arguments in opposing summary judgment as to Plaintiff's contract claim: (1) "the thorny issue of credits owed AIS" constitutes a dispute of material fact, rendering summary judgment inappropriate; and (2) Plaintiff's alleged material breaches excused Defendants' performance.

1. Alleged Credits-Owed Issue

In its motion for summary judgment, Plaintiff argues that Defendants have received all credits due.  In support, Plaintiff points to the Coleman Affidavit and accounting records produced during discovery.  Pl.'s Reply Br. 3, ECF No. 60.

In response, Defendants argue generally that "there are still disputed facts regarding whether or not Yellowbook has truly given AIS all of the credits owed."  See Defs.' Surreply Br., ECF No. 61.  In this regard, the only specific allegations that Defendants make are that Plaintiff has not given Defendants the seniority retention discount, and that it is "unclear" whether Plaintiff has given Defendants all credits due, presumably referencing the customer sales adjustments offered for advertisement errors.  Id. at 4-6.  Indeed, during the July 2, 2013, hearing, in response to the Court's question as to how

much Defendants owe, counsel for Defendants responded, "We don't know because based on what they have produced, they haven't met their burden of proving what we owe . . ."  Hr'g Tr. 21:20-23, July 2, 2013.

In support of their allegation that credits owed remain unaccounted for, Defendants cite only to "log books" which Defendants represent were produced during discovery.  Hr'g Tr. 22:14-17, July 2, 2013; see also Defs.' Surreply Br. 4-6 (citing generally to portions of log books indicating mistakes in credits given, and questioning whether AIS's account received the seniority discount).  However, in doing so Defendants fail to carry their burden under Rule 56; namely, Defendants fail to demonstrate that the proffered "log books" or call logs would be admissible at trial.  Defendants offer no foundational evidence establishing the call log's authenticity or its admissibility as a business record.  Accordingly, Defendants fail to meet their burden of raising a genuine issue of material fact as to any credits owed.

### 2. Plaintiff's Alleged Breach

Defendants likewise fail to demonstrate a genuine dispute of material fact as to how Plaintiff's alleged breaches of subsequent "oral" agreements would excuse Defendants' duty to pay under the parties' written agreements.  Defendants initially

argued that the advertisements Plaintiff published on behalf of AIS were so defective—due predominantly to Plaintiff's failure to correct errors and Plaintiff's sales personnel making unauthorized advertising decisions on behalf of AIS—that Plaintiff essentially published advertisements of Plaintiff's own creation, thereby "depriving AIS the benefit of its bargain." Defs.' Br. in Support of Resp. to Pl.'s Mot. Summ. J. on Pl.'s First Am. Compl. 12-17. Factually, however, Defendants point to no evidence of record showing examples of advertisements produced that look materially different from those that Plaintiff published. In fact, the only evidence to which Defendants point is again the call logs, discussed above. See id. (citing call logs).[11]

---

[11] Plaintiff argues that the call logs constitute an inadmissible exhibit containing layers of hearsay, and therefore the Court should not consider it in deciding the motions for summary judgment. As stated above, the Court agrees. Although it might be admissible under the business records exception, Rule 803(6) of the Federal Rules of Evidence, Defendants have laid no foundation for the proffered call log documents.

Plaintiff also argues that the notations in the call logs are not understandable, and do not establish wrongdoing. In addition to failing to establish a foundation, the call log does not raise a genuine dispute of material fact as to the existence of and terms of subsequent "oral" contracts or whether Defendants are excused from their obligation to pay for advertising services by virtue of a set-off. These notations are confusing, at best, and absent a sponsoring witness—which Defendants have neither identified nor proffered—Defendants fail to demonstrate preliminarily that these notations would be admissible at trial.

Although originally unclear whether they were claiming breaches under the parties' written agreements, Defendants have since clarified their allegation to be that Plaintiff breached subsequent "oral" agreements.  Defs.' Surreply Br. 5 (citing Defs.' Counterclaim ¶ 19).  Thus, as now argued, the success of Defendants' excuse to performance under the parties' written contracts must rise or fall based on the terms of the alleged subsequent "oral" agreements with Plaintiff (which also constitute the basis for Defendants' counterclaim discussed below).  See Defs.' Answer & Countercl. 19-23.  However, for the reasons stated above, in relying solely on their proffered call logs as proof of alleged "oral" agreements, Defendants fail to demonstrate the terms of any subsequent oral agreements that contradict or supersede the written agreements or how those "oral" agreements would establish a set-off discharging their obligation to pay under the written agreements.

In sum, the Court finds that Plaintiff has demonstrated the existence of valid written contracts and the terms thereto, Defendants' breach for failure to pay under those contracts, the face value of the contracts, and the unpaid balance.  Because Defendants fail to point to admissible evidence of record raising a genuine issue of material fact as to the validity, terms, breach, or unpaid balance on the eighty-six contracts at issue, the Court finds that Defendants fail to

carry their burden under Rule 56, and summary judgment for Plaintiff on its Complaint is appropriate.

## V. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIM

Finally, the Court will address Plaintiff's motion for summary judgment as to Defendants' counterclaim. Defendants' counterclaim sounds in contract and, as discussed above, is based on Plaintiff's alleged breach of subsequent "oral" contracts.

At trial, Defendants, as the party bringing a breach-of-contract counterclaim, would bear the burden of establishing the existence of a contract and its terms. See Omicron Sys., 860 A.2d at 564. The only evidence of record to which Defendants point in support of their counterclaim are the call logs discussed above.[12] For the reasons already stated, in relying solely on this document Defendants fail to point to

---

[12] Even after making all reasonable inferences in their favor and assuming the admissibility of the call logs, the portions to which Defendants cite would still fail to raise a genuine issue of material fact thereby preventing dismissal at the summary judgment phase. Defendants point to isolated portions of the call logs as evidence of Plaintiff's alleged "breaches" of oral agreements, wherein customer service representatives discuss needed changes and failure to make previously-requested changes to advertisements, as well as sales errors. Defs.' Br. in Support of Resp. to Pl.'s Mot. Summ. J. on Defs.' Countercl. 9-15. However, at best the existence and terms of these alleged oral agreements are confusing and altogether unclear. More importantly, the call logs fail to support a claim for a set-off or damages—to which Defendants would be legally entitled—with any reasonable certainty.

admissible evidence of record that supports their counterclaim. Accordingly, on this basis alone Defendants' counterclaim cannot survive Plaintiff's motion for summary judgment.

Apparently realizing the fragility of their position, Defendants refined their counterclaim as resting on alleged subsequent "oral" agreements, and for good reason: the parties' written contracts defeat Defendants' argument that their performance is excused, and likewise defeat Defendants' counterclaim. As per the written contracts, Plaintiff did, indeed, publish advertisements on behalf of AIS, for which AIS rendered some payments. Assuming—without deciding—that the instances to which Defendants cite would constitute material breaches of Plaintiff's duty to publish advertisements under the written contracts, Defendants have produced no evidence on which a reasonable jury could find the advertisements produced were so deficient as to constitute a material breach of all of their contracts with Plaintiff, thereby excusing their duty to pay under the written contracts, entirely.

But more importantly, the parties' written contracts contain provisions specifically disclaiming the liability Defendants seek to establish, and the damages Defendants' seek to recover—namely, lost profits. See Defs.' Countercl. ¶ 17. Accordingly, for these additional reasons Defendants' Counterclaim could not survive summary judgment.

Additionally, as to Plaintiff's liability under the written contracts, Paragraph 7(D) limits Plaintiff's liability for "errors or omissions" in advertising to "the price of the listing in question," disclaiming liability for "lost profits, direct or indirect, special, consequential, incidental or contingent damages arising out of such an omission or error." Paragraph 7(E) further disclaims liability "for any other damages"—including those raised in a breach of contract action.

Moreover, Paragraphs 10(A)-(B) place the burden on Defendants, as the customer, to ensure that it has the right to use any materials submitted for publication and to comply with all laws applicable to its business. And Paragraph 10(C) provides that Defendants will indemnify and hold Plaintiff harmless for any liability stemming from a breach of the warranties contained in Paragraphs 10(A)-(B), "whether or not partially attributable to the negligence of the Publisher"; further, Defendants "will pay all expenses, including reasonable attorney fees, settlements, and/or judgments, incurred by Publisher in the defense thereof." The parties did not contract for legal services, only for advertising services. Thus, to the extent that Defendants seek recovery for advertisements "in violation of the Pennsylvania consumer protection laws and

caused AIS to be sued by the Pennsylvania Attorney General,"[13] the written contracts placed the burden on Defendants to ensure their own compliance, and expressly preclude the damages Defendants seek.

Defendants seek to avoid this result by arguing that Plaintiff's "stipulated damages clause" and "exculpatory clause" are not part of the parties' written agreements. Defs.' Br. in Support of Resp. to Pl.'s Mot. Summ. J. on Defs.' Countercl. 15. This argument fails. For the reasons stated above, the Court rejects Defendants' argument that they did not consent to these terms, which appear on the reverse side of the contracts. The Court also rejects Defendants' alternative argument that these provisions are unenforceable because they violate Pennsylvania law.

First, Defendants' counterclaim sounds in contract, not in negligence. Thus, Defendants' negligence-based arguments necessarily fail as irrelevant.

Second, Pennsylvania courts have upheld limitation-of-damages provisions. See, e.g., Bash v. Bell Tel. Co., 601 A.2d 825, 829 (Pa. Super. 1992) (finding that contract between advertiser and telephone company was "matter of private contract

_____

[13]      In their counterclaim, Defendants alleged that Plaintiff implemented advertisements that it "knew" to be in violation of the law. However, Defendants point to no evidence of record to support this claim.

law" to which public utility regulations did not apply); <u>Vasilis v Bell of Pa.</u>, 598 A.2d 52, 53-54 (Pa. Super. 1991) (affirming judgment on pleadings in favor of publisher where limitation of damages provision limited publisher's liability to applicable monthly charge for advertising, reasoning that "parties contracting for paid advertising are at liberty to fashion the terms of their bargain"); <u>Behrend v. Bell Tel. Co.</u>, 363 A.2d 1152, 1165 n.16 (Pa. Super. 1976) ("However, yellow pages listings and advertisements are generally considered outside the realm of necessary services and are usually the subject of a private contract between the customer and the telephone company."), <u>vacated on other grounds</u>, 374 A.2d 536 (Pa. 1977).

Defendants cite no case law holding, as they claim, that the legality of a limitation-of-damages provision turns on the identity of the publisher. Similarly, Defendants cite no case law instructing courts to interpret an otherwise valid limitation-of-damages provision as a liquidated damages provision. Accordingly, Defendants reliance on <u>Holt's Cigar Co. v. 222 Liberty Associates</u> is misplaced. 591 A.2d 743, 747-49 (Pa. Super. 1991) (setting forth standard for determining whether liquidated damages clause constitutes unenforceable penalty). Thus, even assuming that Defendants could establish the existence and terms of subsequent "oral" contracts either excusing their payment obligation or otherwise creating a right

to a set-off, Defendants' counterclaim could not withstand Plaintiff's motion for summary judgment on the alternate grounds that the parties' limitation-of-damages provisions expressly preclude the damages that Defendants seek. Defendants point to no evidence under their alleged "oral" agreements suggesting that the parties intended to modify or otherwise waive these provisions of the written contracts. Accordingly, Plaintiff is entitled to judgment as a matter of law on Defendants' counterclaim.

## VI. CONCLUSION

This case has been pending for over two years, during which the Court has afforded Defendants both the time and the opportunity to plead their case. Now at the summary judgment phase and having chosen to proceed on the merits without further discovery, the time has come for Defendants to point to admissible evidence of record that raises a genuine issue of material fact for trial. Defendants fail to do so, and Plaintiff is entitled to judgment as a matter of law. For the foregoing reasons, the Court will grant Plaintiff's motions for summary judgment. An appropriate order will follow.